IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JOHN RAMOS,

      Plaintiff,

vs.                                                    No. CIV-03-0131 LH/LFG

JOHN POTTER, Postmaster General,
UNITED STATES POSTAL SERVICE,

and

AMERICAN POSTAL WORKER'S UNION, AFL-CIO,

      Defendants.

### PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**COMES NOW** Plaintiff John Ramos ("Ramos") by and through his counsel of record, Law Offices of Michael E. Mozes, P.C., and hereby submits his proposed Findings of Fact and Conclusions of Law in accordance with the Pretrial Order of the Court.

### FINDINGS OF FACT

1.      Plaintiff John Ramos is a citizen of the United States and a resident of the State of New Mexico.

2.      Defendant American Postal Workers Union, AFL-CIO ("APWU") is a labor organization headquartered in Washington, D.C., with local branches throughout the United States, including the County of Bernalillo, State of New Mexico.

3.      Ramos began working for the United States Postal Service on February 18, 1997.

4.      On October 9, 1998, the USPS sent Ramos a Notice of Proposed Removal ("NOPR"). The NOPR alleged that Ramos had unlawfully received worker's compensation

payments through fraudulent means.

5. On November 25, 1998, the USPS sent Ramos a Letter of Decision, stating that the proposed removal would be effective on November 27, 1998.

6. On November 27, 1998, the APWU Local 380, Ramos's union representative, filed a grievance on Ramos' behalf, grieving the removal action.

7. The grievance moved through Steps 1, 2, and 3 of the grievance procedures described in the Collective Bargaining Agreement ("CBA") between the USPS and the APWU. On June 21, 1999, the APWU appealed the USPS' denial of the Ramos grievance at Step 3 to arbitration.

8. On February 1, May 21, and May 22, 2001, arbitration proceedings were held with respect to the Ramos grievance.

9. On July 24, 2001, the arbitrator on the Ramos grievance issued his decision, finding that the grievance was sustained. The arbitrator stated in the Award section of the decision that Ramos was to be reinstated to his former position and was to be made whole and other benefits minus earnings.

10. On August 1, 2001, the APWU, through Steve Zamanakos, the national business agent who handled the Ramos arbitration, wrote Local 380 and Ramos. Zamanakos advised that the arbitrator had issued a written award returning Ramos to work and making him whole. Therefore, the grievance was considered closed through arbitration.

11. On August 9, 2001, Ramos wrote Eric Martinez, the USPS Plant Manager where Ramos had worked. Ramos requested information about his return to work. By August 9, 2001, Ramos had received a Form 50 from the USPS stating that Ramos had been reinstated.

12. On August 21, 2001, James Mercurio, USPS' Human Resources Manager, wrote Ramos and stated that the Form 50 had issued in error, that Ramos had not been reinstated to work, and that the USPS intended to vacate and appeal the arbitration award.

13. Ramos spoke with the APWU (Zamanakos) and Local 380 (Gene Gabaldon) concerning the USPS' August 21st letter. Ramos received no explanation nor advice from the APWU and was told that he had to wait to see how the USPS would respond to the arbitration award.

14. The USPS filed suit, No. CIV-01-1222M, in the United States District Court for the District of New Mexico to vacate the arbitration award on October 25, 2001.

15. On March 13, 2002, the APWU filed its Answer to the USPS suit and counterclaimed for enforcement of the arbitration award.

16. On July 3, 2002, the USPS and APWU participated in a settlement conference before the Honorable Magistrate Richard L. Puglisi with respect to the October 2001 suit.

17. The parties settled the USPS suit, agreeing to enforce the arbitration award as written–reinstating Ramos to his former position and making him whole with respect to lost wages and benefits.

18. Over the period of 15 months (August 2001 to October 2002), Ramos tried repeatedly to contact the APWU to find out what was happening with respect to the arbitration award. Ramos received curt and non-responsive replies from the APWU.

19. At no time between August 1, 2001 and October 31, 2002 did the APWU advise Ramos that a lawsuit had been filed by the USPS to vacate the arbitration award, that the suit was pending in the New Mexico federal court, or that the case had settled.

20. Prior to settling the USPS suit, the APWU did not consult with Ramos nor advise him of the settlement conference. Furthermore, after settling the suit on July 30, 2002, the APWU did not contact Ramos with the news of the settlement.

21. On October 4, 2002, not knowing the status of the arbitration award nor if the APWU was doing or had done anything on his behalf, Ramos filed suit in the United States District Court, No. CIV-02-1251 BB/RLP, for enforcement of the arbitration award.

22. On October 30, 2002, Stanley Gallegos, a supervisor with the USPS, telephoned Ramos and told him that he had to return to work on October 31, 2002 or face termination. Prior to this communication, Ramos had not had any communications with the USPS since approximately August 21, 2001.

23. When Ramos returned to work, Gallegos advised Ramos that he could not work until he brought in updated medical documentation. Gallegos forced Ramos to take annual leave and advised Ramos not to return to work until November 16, 2002.

24. On October 31, 2002, Ramos approached a union steward and explained what had happened when he returned to work. The steward assured Ramos that a grievance would be filed. No grievance, however, was filed.

25. In early November 2002, Zamanakos called Ramos and stated, for the first time, that a lawsuit and been filed and settled with respect to the Ramos arbitration award. This was the first notice of such that Ramos received from the APWU.

26. On November 4, 2002, the USPS provided paperwork to Ramos with respect to the payment of back pay and other benefits awarded through arbitration.

27. During the first part of November 2002, Ramos called the union repeatedly to

receive representation and help with the on-going problems Ramos faced in being reinstated and paid his back wages. Union officials would either hang up the telephone or refused to speak with Ramos. The union refused to file grievances on Ramos' behalf and refused to speak with him about the difficulties he encountered in enforcing the settlement.

28.     The USPS continued to keep Ramos out of work during the month of November 2002, even after Ramos provided the requested medical documentation on at least two occasions.

29.     Ramos complied with the USPS' requests for medical documentation, providing reports from Drs. Goldman and King.

30.     Ramos had his attorney contact the APWU's attorneys in hopes of receiving information related to settlement of the USPS suit, reinstatement, and payment of back pay. The APWU did not respond to the inquiries of Ramos' attorney.

31.     The CBA, Art. 15, § 4(a), provides that "every effort shall be made to ensure timely compliance and payment of monetary grievance settlements and arbitration awards."

32.     On December 6, 2002, Ramos submitted the back pay paperwork to the USPS. The APWU provided Ramos no help or assistance in preparing this paperwork.

33.     Jerry Garcia, who was handling the back pay issue for the USPS, on repeated occasions gave Ramos dates for resolution of the back pay amount that kept getting pushed back.

34.     The CBA, Art. 15, § 4(A) provides that, in the event an employee is not paid within 60 days of an arbitration award, the employee will be granted a pay advance equal to the net amount due or 70% of the payment owed.

35.     The APWU refused to enforce this provision of the CBA with respect to Ramos.

36. The APWU did nothing with respect to ensuring that Ramos would be paid in accordance with the provisions of the CBA.

37. Ramos worked approximately 7 hours between the period October 31, 2002 and December 12, 2002. The APWU and the USPS did not abide by the agreement to reinstate Ramos to his former position.

38. On December 11, 2002, Ramos attended a meeting with Karen Wheeler (USPS), Jerry Garcia (USPS), and Gene Gabaldon (APWU) for the purpose of discussing jobs Ramos could perform within his medical restrictions.

39. As of December 11, 2002, Ramos' doctors did not permit Ramos to operate machinery or work in a dusty environment because Ramos suffered from epilepsy and lung disease.

40. Rather than accommodate Ramos' medical restrictions through a light duty job, the USPS forced Ramos to take annual leave and be absent from the workplace. When Ramos complained to the APWU about the refusals to provide Ramos work, the APWU responded by not filing a grievance and telling Ramos that he was a "persona non grata."

41. At the beginning of the December 11, 2002 meeting, Gabaldon confronted Ramos and became irate because he believed Ramos was tape recording the meeting. Ramos denied that he had a tape recorder. The meeting ended when Ramos understood that Gabaldon would not provide Ramos any fair representation at the meeting.

42. On December 12, 2002, Wheeler wrote Ramos and stated that any tape recording of conversations at the USPS could result in Ramos' removal from the USPS. Wheeler further stated that Ramos could not return to work unless instructed to do so.

43.     Mr. Ramos' last day of work at the USPS was December 11, 2002.

44.     On December 18, 2002, another meeting was held to address return to work issues related to Mr. Ramos' medical restrictions. Ramos participated fully in this meeting, also attended by Wheeler and Garcia, which principally dealt with the nature of Ramos' restrictions and the jobs he could or could not do. Despite this meeting, the Postal Service did not return Ramos to work.

45.     On January 9, 2003, Ramos attended a meeting with Gabaldon for the purpose of filing a grievance related to the failure to accommodate Ramos in the workplace. While the Ramoses sat in the parking lot prior to the Gabaldon meeting, Gabaldon approached the vehicle and made a crude and inappropriate gesture. Ramos then met with Gabaldon. Gabaldon became upset when Ramos questioned him about the APWU's failure to adequately represent him. Gabaldon then became angry and left the room, refusing to speak with Ramos about the filing of a grievance.

46.     On December 20, 2002, Ramos' attorney wrote Jerry Garcia regarding the back pay issue and a return to work. Garcia responded to Mozes on December 23, 2002, stating that the APWU was the exclusive bargaining agent for Ramos and that the USPS would not discuss Ramos' employment status, including enforcement of the arbitration, with an attorney.

47.     On January 28, 2003, Ramos filed the instant lawsuit.

48.     On February 3, 2003, the USPS requested that Ramos attend another meeting on February 10, 2003 to discuss the types of work Ramos could perform.

49.     Ramos, fearful of not having representation at the February 10th meeting because of the strained relationship with the APWU, requested that his attorney be permitted to attend the

meeting. The USPS refused this request. Ramos did not attend the meeting.

50. The USPS, on February 12, 2003, directed Ramos to attend a fact-finding meeting on February 18, 2003 to discuss the failure to attend the February 10th meeting. Ramos declined to attend the February 18th meeting because he would be forced to do so without representation.

51. On April 22, 2003, Ramos received a NOPR from the Postal Service because he had failed to attend the February 10, 2003 and February 18, 2003 meetings with USPS management.

52. On July 21, 2003, Ramos settled his claims against the USPS, waiving all claims and grievances against the USPS.

53. Prior to signing the settlement documents, Ramos did not know of any grievance the APWU had filed on his behalf.

54. Mr. Ramos has not received any interest on the back pay awarded through the settlement of the USPS suit, although entitled to such under the CBA. A Memorandum of Understanding between the USPS and the APWU provides for the payment of interest on a back pay award through arbitration in which an employee grieved a disciplinary removal. This provision dated back to 1990.

55. During the period between October 31, 2002 and July 21, 2003, Ramos used annual leave and other leave on order to be paid. When Ramos' leave ran out, he was placed in a leave without pay status.

56. Ramos did not receive reinstatement into his former position in accordance with the arbitration award and settlement agreement.

57. Ramos did not receive his back pay and benefits in accordance with the

arbitration award and settlement agreement.

58. The only reason Ramos filed suit in the federal district court in October 2002 was due to the failure of both the USPS and APWU to adequately keep Ramos informed of the status of the arbitration award. Defendants completely failed to apprize Ramos of the events surrounding the arbitration award and enforcement of the same.

## CONCLUSIONS OF LAW

1. The subject matter of this action against the APWU, a breach of the duty of fair representation, was filed within the six-month statute of limitations under the Labor-Management Relations Act.

2. The Court has jurisdiction over Ramos' claims under the Labor-Management Relations Act, 29 U.S.C. § 185. There is personal jurisdiction over the parties and venue is proper in this Court.

3. Defendant APWU is a "union" within the meaning of the Labor-Management Relations Act.

## BREACH OF COLLECTIVE BARGAINING AGREEMENT

4. The USPS breached the provisions of the collective bargaining agreement by failing to abide the terms of the July 24, 2001 arbitration award. The USPS did not reinstate Ramos and did not make Ramos whole with respect to back pay and benefits. The USPS violated Art. 15, §5.A.6 of the CBA, which states in pertinent part, "All decisions of an arbitrator shall be final and binding."

5. The USPS breached the provisions of the collective bargaining agreement and the written settlement entered into the parties on July 30, 2002 in No. CIV-03-1222M by not

reinstating Ramos into his former position and making him whole with respect to back pay and benefits.  This action on the part of the USPS violates Art.5 of the CBA, which states, "The Employer will not take any actions affecting wages, hours, and other terms and conditions of employment as defined in Section 8(d) of the National Labor Relations Act which violate the terms of this Agreement or are otherwise inconsistent with its violations under law."

6. The USPS breached the provisions of the collective bargaining agreement by forcing Ramos out of work because of his medical restrictions, failing to provide Ramos reasonable accommodations, and acting in bad faith in reviewing and evaluating Ramos' ability to perform the essential functions of a job.  These acts and failures to act by the USPS are violations of the following provisions of the CBA: Art. 13, §§ 1(B); 2©); and 4(A).

7. The USPS breached the provisions of the collective bargaining agreement by not ensuring that every effort would be made to ensure timely compliance and payment of monetary grievance settlements and arbitration awards.  Art. 15, § 4(A).  The USPS delayed almost one year after settling the federal action to pay Mr. Ramos his back pay.  Such a delay does not constitute timely compliance.

8. The USPS further breached the provisions of the collective bargaining agreement by not abiding by Art. 15, §4(A), which states that in the event an employee is not paid within 60 days of an arbitration award, the employee will be granted a pay advance equal to 70% of the payment owed.  The USPS violated this provision by not making such payment to Ramos, despite his demand that USPS do so.

9. Due to these open breaches of the collective bargaining agreement by the USPS, which constitute a repudiation of the remedies contained in the CBA, Ramos is excused from

failing to exhaust administrative remedies with respect to his claims. *Aguinaga v. United Food and Commercial Workers International Union*, 993 F.3d 1463, 1471 (10th Cir. 1993); *United Food and Commercial Workers, Local Union No. 7R v. Safeway Stores, Inc.*, 889 F.2d 940, 944 (10th Cir. 1989).

    10.    To prevail against an employer under a hybrid LMRA action, the employee must prove: (1) some conduct by the worker's union that breached the duty of fair representation; (2) a causal connection showing that the union's breach affected the integrity of the process; and (3) a violation of the collective bargaining agreement by the company. *Webb v. ABF Freight System*, 155 F.3d 1230, 1239 (10th Cir. 1998).

    10.    The USPS is liable to Ramos for the breaches set forth above.

    11.    The USPS has resolved these breaches through a Settlement Agreement entered into by Ramos and the USPS on July 21, 2003.

## BREACH OF THE DUTY OF FAIR REPRESENTATION

    12.    The APWU national union and Local 380 have a symbiotic, rather than autonomous, relationship. *Snow v. Communications Workers of America*, 2000 U.S. Dist. Lexis 22488, \*13 (D. Kan 2000); *Hardison v. Trans World Airlines*, 375 F.Supp. 877, 880 (W.D.Mo. 1974). The national APWU exercises a degree of control over Local 380 that imputes vicarious liability to the national union for the acts and failures to act of Local 380. In addition, the national union necessarily implemented the settlement agreement in No. CIV-01-1222M through the Local 380.

    13.    A union breaches its duty of fair representation where it engages in conduct toward a member that is arbitrary, discriminatory, or in bad faith. *Schwartz v. Brotherhood of*

11

*Maintenance Way Employees*, 264 F.3d 1181, 1185 (10th Cir. 2001); *Considine v. Newspaper Agency Corp.*, 43 F.3d 1349, 1357 (10th Cir. 1994); *Aguinaga*, 993 F.2d at 1470.  A union's duty of fair representation requires the union to always act in good faith and honesty of purpose in the exercise of its discretion of behalf of individual employees.  In this matter, the APWU has not acted in good faith and honesty of purpose by refusing to communicate with Ramos about the events following the arbitration award, including, but not limited to, the existence of a lawsuit, by not participating in the enforcement of the arbitration award with respect to Ramos' reinstatement and receipt of back pay, by adversely affecting Ramos' return-to-work by falsifying charges against Ramos, by refusing to file grievances on Ramos' behalf, and by failing to advise Ramos of actions allegedly taken on his behalf.

14.     A deliberate abandonment of a member's rights under the collective bargaining agreement constitutes bad faith on the part of a union.  *Aguinaga*, 993 F.2d at 1471.  The APWU deliberately abandoned Ramos' contractual rights by not enforcing the arbitration award and settlement agreement, by failing to process grievances on Ramos' behalf, by refusing to aid Ramos to find an accommodated position, and by failing to advise Ramos of grievances filed on his behalf.

15.     It is a breach of the duty of fair representation to trade away an individual's contractual rights without the individual's consent.  *Id.*  The APWU traded away Ramos' contractual rights and breached its duty of fair representation by settling a lawsuit related to Ramos' arbitration award without consulting with Ramos, then doing nothing to enforce the settlement agreement, and finally, preventing Ramos from finding an accommodated position by causing the cancellation of a meeting called for the purpose of discussing such an

accommodation.

16. Proof that a union breached its duty of fair representation is an exception to the requirement of exhaustion of administrative remedies because the union has ceased to function as the individual's representative. *Id.* Where a union has deprived the employee of an opportunity to proceed under the procedures of a collective bargaining agreement, the union has breached its duty of fair representation. *Safeway Stores,* 889 F.2d at 944-45. A union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory manner. *Young v. United Auto. Workers Labor Employment and Training Corp.*, 95 F.3d 992, 996-97 (10th Cir. 1996). In this matter, Ramos is excepted from the requirement of an exhaustion of administrative remedies because the union did cease to function as Ramos' representative. The union refused to file grievances on Ramos' behalf, failed to enforce Ramos' contractual rights, failed to act to reinstate Ramos to his former position, failed to act so that Ramos could receive his back pay, and refused to speak with Ramos when Ramos sought union assistance. The union both ignored to file meritorious grievances on Ramos' behalf and the grievances filed after Ramos returned to work were processed in a perfunctory manner.

17. Perfunctory union conduct may be deemed "arbitrary." *Schwartz*, 264 F.3d at 1185; *Webb*, 155 F.3d at 1239.

18. Personal animosity is sufficient to constitute "invidious discrimination" under the provisions of the LMRA. *Id.* at 1186. The APWU engaged in "invidious discrimination" in that the union allowed personal animosity to determine whether it would provide Ramos his contractual rights under the CBA, to determine that it would not help Ramos in the enforcement of the settlement agreement pertaining to the July 2001 arbitration award, and to determine to

13

what extent the union would become involved in the accommodation process of Ramos.

19.    Where a union does not pursue enforcement of an arbitration award for a year, the union is liable for its indifference and inattention to its member's contractual rights. *Safeway Stores,* 889 F.2d at 942. In the instant case, the APWU did nothing to enforce the settlement agreement entered into between the APWU and the USPS in July 2002. Ramos requested information from the union regarding the enforcement of the settlement agreement and the union did not respond. Further, Ramos had to engage a private attorney to enforce the settlement agreement. Ramos filed a lawsuit to enforce his contractual rights. Eventually, Ramos, without any help from the APWU, settled with the USPS so that he could receive the back pay and benefits due him. The APWU was indifferent and inattentive to Ramos' contractual rights by settling a lawsuit related to an arbitration award and then failing to enforce the terms and conditions of the settlement.

20.    An employee is excused from exhaustion of administrative remedies where either the union or the employer has repudiated the CBA's grievance procedure. *Id.* at 944. In addition, the employee is excused from exhaustion of remedies where the union has acted in an arbitrary or discriminatory fashion or in bad faith. *Id.* Finally, the employee is excepted from exhaustion where he proves that his ability to prosecute a particular breach of contract claim is seriously undermined by the union's failure to represent him adequately. *Webb*, 155 F.3d at 1244. The APWU repudiated the grievance procedures by failing to enforce Ramos' arbitration award, failing to file grievances presented by Ramos, and failing to advise Ramos of grievances filed. The APWU also seriously undermined Ramos' breach of contract claim against the USPS by not representing Ramos on the enforcement of the settlement agreement, doing nothing for

Ramos and not responding to Ramos requests for union assistance.

21. The APWU is liable to Ramos for its breach of the duty of fair representation.

## RELIEF

Having determined that the APWU is liable for the acts of its officers, agents, and employees in breaching its duty of fair representation to Ramos, the Court must now determine what relief, if any, is appropriate:

22. Ramos is entitled to be made whole, in accordance with the July 2001 arbitration award and the July 2002 settlement agreement. *Aguinaga v. United Foods and Commercial Workers Int'l Union*, 993 F.2d 1463, 1473 (10th Cir. 1993).

23. In hybrid cases, such as this case, the "governing principle is to apportion liability between the employer and the union according to the damage caused by each." *Vaca v. Sipes*, 386 U.S. 171, 197 (1966). However, this principle has exceptions. This principle may not be applicable where a union affirmatively caused the employer to commit the breach or where the union and the employer actively participated in the other's breach. *Aguinaga*, 993 F.2d at 1474. In such cases, liability is joint and several. *Id.* The Court finds that the conduct of the APWU permitted the employer to commit the breach of the settlement agreement and that APWU afterwards acted and failed to act in such a fashion as to participate in the breach of the USPS.

24. The APWU is liable to Ramos for the wages and benefits lost during the period October 31, 2002 through July 20, 2003. The Court determines that this amount of wages and benefits lost amounts to _____.

25. The APWU is further liable for the interest to be paid on the back pay the USPS paid Ramos through settlement of Ramos' claims against the USPS in this action. Ramos made

timely inquiries to the APWU with respect to the interest due on the back pay. Further, the collective bargaining agreement, through a memorandum of understanding, provides that Ramos be paid interest on the back pay awarded. The Court finds that Ramos is entitled to $22, 902 in interest.

26. The Court awards Ramos pre-judgment interest to Ramos. *United Foods v. Safeway*, 889 F.2d 940, 945 (10th Cir. 1989); *Aguinaga v. United Food and Commercial Workers Int'l Union*, 720 F.Supp. 862, 875 (D. Kan. 1989).

## ATTORNEYS FEES

27. Plaintiff, as the prevailing party on his breach of duty fair representation claim, is entitled to his reasonable attorneys fees and costs. 29 U.S.C. § 1985, *et seq.* The amount of these attorneys fees and costs will be determined at a subsequent date.

>Respectfully submitted,
>
>LAW OFFICES OF MICHAEL E. MOZES, P.C.
>
>Electronically Filed on March 29, 2005
>
>Michael E. Mozes
>Attorney for Plaintiff Ramos
>5732 Osuna N.E.
>Albuquerque, NM 87109
>(505) 880-1200

**I HEREBY CERTIFY** that a copy of
the foregoing pleading was hand-delivered
to opposing counsel of record on this
7th day of February, 2005.

Electronically Filed on March 29, 2005

Michael E. Mozes